FRANK GILHOOLEY, Appellant, v. HENRY P. BURGARD, Respondent.

Master and servant — negligence — action under Employers' Liability Act — erroneous reversal by Appellate Division of judgment for plaintiff on ground that defendant was not guilty of negligence as matter of law — effect of reversal of decision of Appellate Division by Court of Appeals.

1. Upon examination of the evidence in an action for negligence brought by a servant against the master under the Employers' Liability Act, held, that a question of fact was presented for determination by a jury as to the actionable negligence of the defendant in the method adopted for doing the work in question; as to whether or not the plant was defective, in that there existed on the part of defendant a failure to supply proper apparatus and adopt such measures as would reasonably guard against an obvious danger which might arise from the method adopted, and that the Appellate Division was in error in determining as matter of law that the defendant was not guilty of negligence.

2. The Appellate Division having reversed the judgment of the Trial Term solely upon the ground that plaintiff had failed to estab-

lish actionable negligence on the part of the defendant, the determination was equivalent to an express reversal on the law and affirmance on the facts. The conclusion of this court that the reversal upon the law was error leaves the facts found by the jury favorable to plaintiff, unaffected by the order of reversal.

*Gilhooley* v. ·*Burgard*, 175 App. Div. 911, reversed.

(Argued January 9, 1919; decided February 4, 1919.)

APPEAL from a judgment, entered October 24, 1916, upon an order of the Appellate Division of the Supreme Court in the fourth · judicial department, reversing a judgment in favor of plaintiff entered upon a verdict and directing a dismissal of the complaint on the ground that the plaintiff failed to show actionable negligence in an action to recover for personal injuries.

The facts, so far as material, are stated in the opinion.

*Thomas Woods* for appellant. The defendant was guilty of negligence causing plaintiff's injuries. (*Donohue* v. *East River M. & L. Co.*, 224 N. Y. 149; *Maloney* v. *Cunard Steamship Co., Ltd.*, 217 N. Y. 278; *Faith* v. *N. Y. C. & H. R. R. R. Co.*, 109 App. Div. 222; 185 N. Y. 556; *Connolly* v̇. *Hall & Grant Const. Co.*, 192 N. Y. 182; *English* v. *Milliken Bros., Inc.*, 132 App. Div. 501; *McGlynn* v. *Pennsylvania Steel Co.*, 144 App. Div. 343; *Tamaseric* v. *Beckwith*, 145 App. Div. 78; *Baccelli* v. *New England Brick Co.*, 138 App. Div. 656; *Palin* v. *Cary Brick Co.*, 133 App. Div. 483; *Finklestein* v. *Kramer*, 133 App. Div. 565; 197 N. Y. 594; *Pepe* v. *Utica Pipe Foundry Co.*, 132 App. Div. 458; *O'Brien* v. *Buffalo Furnace Co.*, 183 N. Y. 317; *Doing* v. *N. Y., O. & W. Ry. Co.*, 151 N. Y. 579; *Dowd* v. *N. Y., O. & W. Ry. Co.*, 170 N. Y. 459; *Guilfoyle* v. *McDermott*, 146 App. Div. 900; 205 N. Y. 557; *Moon* v. *Coon Const. Co.*, 216 N. Y. 178.) The plaintiff was not guilty of contributory negligence and did not assume the risk. (*Donohue* v. *E. R. M. & L. Co.*, 224 N. Y. 149; *Maloney*

v. *Cunard S. S. Co.*, 217 N. Y. 278; *Seyford* v. *Southern Pacific Co.*, 216 N. Y. 613; *Robinson* v. *Ocean S. S. Co.*, 162 App. Div. 169; *Boyle* v. *Degnon-McLean Const. Co.*, 47 App. Div. 311; *Tully* v. *N. Y. & T. S. S. Co.*, 10 App. Div. 463; 162 N. Y. 614; *Caboni* v. *Gott*, 149 App. Div. 440; *Thompson* v. *Levering & Garrigues*, 155 App. Div. 554; *Graves* v. *Stickley Co.*, 125 App. Div. 132; 195 N. Y. 584.)

*H. D. Bailey* for respondent. It appears from the evidence in this case that the plaintiff was a man of vast experience in the operation of the dredge, including the work of removing the crane; that his injuries were sustained because he did not take ordinary precautions for his own safety, and that he assumed the risk. (*Duke* v. *American Museum*, 157 App. Div. 640; *Hammond* v. *Union Bag & Paper Company*, 151 App. Div. 776; 3 LaBatt on Master & Servant, § 925; *Earl* v. *Clyde S. S. Co.*, 103 App. Div. 21; *Watts* v. *Beard*, 18 App. Div. 243; *Bagley* v. *Consolidated Gas Co.*, 5 App. Div. 432; 160 N. Y. 695; *Ludlow* v. *Groton Bridge Company*, 11 App. Div. 452; *Ozogar* v. *Pierce*, 134 App. Div. 800; *Brust* v. *Perkins Co.*, 113 App. Div. 633.) There was no defect in the condition of the ways, machinery or plant, and no negligence of a superintendent or person intrusted with authority over the plaintiff. (*Gmaehle* v. *Rosenberg*, 178 N. Y. 147; *Simpson* v. *Foundation Company*, 132 App. Div. 375; *Vogel* v. *American Bridge Co.*, 180 N. Y. 373; *Quinlan* v. *Lackawanna Steel Co.*, 107 App. Div. 176; *Hope* v. *Scranton*, 120 App. Div. 595.)

HOGAN, J. The defendant was engaged as a contractor on barge canal work in the erection of a dam and locks on the Oswego river at or near Minetto, Oswego county, some few miles south of the point where the river empties into Lake Ontario at the city of Oswego,

N. Y.   The plaintiff was employed by defendant as an engineer upon a dredge used on the work.   He met with an accident causing injuries for which recovery was had at the Trial Term.

At the point where the accident occurred the river is several hundred feet in width.   Coffer dams had been constructed in the river, one running from the westerly shore easterly into the river, a distance of some four hundred feet, to a space of one hundred feet open water, and a second coffer dam some four hundred feet on a line with the first coffer dam referred to running to the shore on the easterly side or bank of the river.   The presence of the two coffer dams in the river necessarily increased the current of the stream passing through the one hundred feet opening to seven or eight miles an hour.

The accident occurred December 16th.   Just prior to that day the dredge on which the plaintiff was employed and the scows used in connection therewith had been in use on the north side of the coffer dam which projected from the west bank of the river and about midway between the bank of the river and the open space between the coffer dams.   On December 15th, one Smith, the superintendent of the defendant, in the presence of the crew of the dredge, said: " We will lay up; we are not going to do this work down here at the lower bridge; you can start to strip her this afternoon.   Get your dipper handle out and take the dipper off, and tomorrow pull under the cableway, take the crane off with the cableway and take it across the river to the west side." Thereupon the dipper and dipper arms were removed and placed on the scow on the north side of the coffer dam, and the scows tied up with ropes and a cable from the dredge.

The cableway, so termed, was constructed as follows: On the easterly and westerly banks of the river a tower some fifty feet in height was erected, from the top of the

towers a steel cable about nine hundred feet in length and two to two and one-half inches in diameter was suspended. A carriage is placed on the cable. From the carriage was hung a single or double block dependent upon the weight to be elevated. A wire rope is rove through the sheaves on the carriage and then from the single or double block, the hoisting block back to the engine. The operation of moving the carriage back and forth on the cable is carried on through an endless chain which runs around another drum on the engine which is controlled by an engineer.. The engine in the present case was on the easterly side of the river close to the tower.

The crew on the dredge consisted of five men, the plaintiff who was the engineer or operator, one Arroway, the crane tender, Charles Thompson, Sr., fireman, one Metcalf and Charles Thompson, Jr., deckhands. On December 16th, the crew took the dredge from the north side of the coffer dam around under its own power into the open waterway to a point about underneath the cableway, a short distance south of the northeast corner of the coffer dam. At a given signal by Arroway, the crane tender, who was upon the coffer dam, the plaintiff, who was operating the engine on the dredge, stopped, dropped the spuds and used a dredge hoist cable for the purpose of fastening the dredge to the end of the coffer dam to hold the same against the current in the river.

Attached to the dredge was a crane twenty-six feet long, eight feet wide at the bottom and three feet at the top or outer edge, V shaped, weighing about six tons. To dismantle the dredge it was necessary to remove the crane from the same. The crane was held. in position in the following manner: A cast iron post called the crane post fits in a ball and socket at the bottom of the post which is under water. At the top of the post was a cap which held the post in position. The cap weighed about two

hundred pounds and consisted of two castings fastened together with four bolts. To remove the crane it was necessary to pull the crane back so that the cap would be free. Before the crane could be taken off and to prevent binding it was essential that the strain on the bolts through the cap be released. Attached to the carriage on the cableway were two chains described as bridle chains about eight feet in length.

Arroway, the crane tender, proceeded to attach the bridle chains to the crane assisted by Metcalf, one of the deck hands. Three several attempts were made before they finally succeeded in placing the chains so that the crane appeared to be balanced in the clear or cap and the crane post free. With the crane in that position it was then a matter of the removal of the bolts holding the cap in position. The crew proceeded to remove the nuts from the bolts in the cap at the top of the crane with wrenches weighing thirty or forty pounds each. Two men were required to handle each wrench. Plaintiff, the engineer, was assisting in the work of dismantling. After the crane had been held for some minutes, and when the nuts were nearly off, the crane suddenly went outward and upward, then back, quickly, striking the plaintiff and causing the injuries complained of.

The action was brought under the Employers' Liability Act. The plaintiff asserts that defendant was negligent in the method employed under the direction of the superintendent of defendant; that the work of dismantling the dredge, including the removal of the crane therefrom by the use of the cableway, was an unusual and unknown method; that it was a dangerous method to adopt in view of the difficulties of holding a crane of the weight of the one in question in the manner directed in this case, and was a method unknown to any of the witnesses employed upon the dredge, all of whom testified that they had never known of the use of a cableway for

removing a crane from a dredge as was undertaken in the present case.

Evidence was introduced on behalf of the plaintiff tending to show that the ordinary and customary way of removing a crane from a dredge and which had been adopted in previous years on the dredge in question, was by the use of shear poles, and such method was described in detail. Evidence was also offered on the part of the plaintiff that no ropes or guide cables were furnished, and in addition two experts were called with reference to the method adopted in this case in the dismantlement of the dredge and the usual and customary method adopted in such work. One witness, Mr. Guilfoyle, who had thirty years' experience and was familiar with the location where this work was done, and who as the fact appeared constructed and used in 1887 the first cableway in use and was familiar with the construction and operation of cableways, was examined at considerable length and gave evidence tending to show that the method adopted by defendant in the use of a cableway was not the customary or ordinary method of dismantling dredges, and in his extended experience he had never known or heard of such method being employed. He described the cableway, the manner of the operation of the same and the effect of the absence of guide ropes in the operation of the work in question as undertaken. He testified that the cable except on the tower was not stayed or guyed in any way; that the absence of such stays or guys would cause the cable to flap or swing, flopping up and down vertically and swing horizontally — a sudden take up or drop of the load would cause the cable to flop or sway one way or the other; that in the attempt to elevate a heavy load with a cableway in the nature of the crane in question, there would be a number of factors which he described as insecure and unsafe connected with the operation, namely, the fasten-

ings on the carriage, the wire rope fastenings on the carriage, danger of slipping, and which may also occur by the fastening of the hoist lift on the hoist block slipping, or by the friction on the drums slipping, thus throwing sudden strains on the cable which would make it jump or sway. He testified that the usual and customary method of dismantling a dredge and removal of a crane therefrom was to dismantle with the power of the dredge, the use of tackle blocks, ropes, shear legs or a frame, and to hold it rigid at all times without any chance of having it jump or sway; that there was no practical way of guying the cableway itself in view of the open space in the river at the time the dredge was dismantled. The second expert witness called by plaintiff, a man of long experience in work of the character carried on, gave evidence along the same lines as that given by Mr. Guilfoyle.

On behalf of the defendant issue was taken upon every material fact asserted by plaintiff, and evidence offered tending to show that the crane as it was elevated out of its position on the dredge on the cableway might have been stayed by means of cables or with fall lines from the dredge, so that when the ends were let loose from the bolts the crane would not leave its position. Additional means by which the crane could have been stayed were referred to. Likewise evidence was introduced as to the method of doing the work by means of shears and falls and danger attendant upon such method. Further evidence was presented on behalf of the defendant upon the issue as to whether or not guy ropes, chains or cables for the purpose of carrying on the work of dismantlement were accessible to the men on the dredge.

The trial judge submitted to the jury the question as to whether or not the method used in dismantling the dredge was a dangerous method or such a method as would be adopted by an ordinarily prudent man. He also charged the jury with reference to the duty of a

master towards his servant, to provide for the servant a reasonably safe place to work, ordinarily safe tools and implements to work with, and reasonably competent fellow-servants, and submitted to the jury the question of the negligence of the defendant, the freedom from negligence of the plaintiff and whether or not the risk was one which the plaintiff assumed.

Without further reference to the evidence adduced on the trial, we conclude that the evidence offered by the parties to this action presented a question of fact for the jury as to the actionable negligence of the defendant in the method adopted for doing the work in question; as to whether or not the plant was defective, in that there existed on the part of defendant a failure to supply proper apparatus and adopt such measures as would reasonably guard against an obvious danger which might arise from the method adopted, and that the Appellate Division was in error in determining as matter of law that the defendant upon the evidence was not guilty of negligence.

The Appellate Division having reversed the judgment of the Trial Term solely upon the ground that plaintiff had failed to establish actionable negligence on the part of the defendant, the determination was equivalent to an express reversal on the law and affirmance on the facts. Our conclusion that the reversal upon the law was error, leaves the facts found by the jury favorable to plaintiff unaffected by the order of reversal.

The order and judgment of the Appellate Division should be reversed and the judgment of the Trial Term reinstated, with costs to appellant in this court and in the Appellate Division.

HISCOCK, Ch. J., CHASE, CARDOZO, POUND, McLAUGH-LIN and ANDREWS, JJ., concur.

Judgment reversed, etc.